This case is under case number 2830 from the Western District of Missouri, Marcia Sorin et al vs. the Folger Coffee Company et al Mr. Boutros? Good morning, Your Honor. Thank you, and may it please the Court, Theodore Boutros for Smucker. This Court should reverse the District Court's Class Certification Order because individual issues predominate over any arguable common issues in this case. Indeed, such individual issues would engulf a jury trial if the dictates of the Supreme Court and this Court following the Supreme Court's decisions in the Walmart v. Dukes case, the Comcast case, the TransUnion case were followed. This Court really was ahead of the curve in its decisions leading up to the Supreme Court's decisions starting in 2011 in Dukes in cases like the Huddock case, the St. Jude case, the Ebert case, the Cody case, the Johanneson case, and Halverson. They all are just very simple applications of those cases require that the Class Certification Order here be vacated and reversed. The District Court took several shortcuts in this case and committed multiple legal errors in certifying this class under the Missouri Consumer Protection Statute, the MMPA, and an unjust enrichment claim. The certification order violates Rule 23, the Rules Enabling Act, and due process. A couple of facts I just wanted to emphasize to set the stage. This case involves Mr. Smith, who is the name planted from Missouri. There is no evidence that any other person from Missouri interpreted the up-to language on the Folgers label the way he purports to interpret it. Not one single other Missouri consumer. There's no expert evidence concerning anybody in Missouri. There are nationwide surveys from the expert that were deemed admissible, but they're nationwide. They don't have anything to do, they don't single out Missouri, they tell us nothing about consumers in Missouri. And as the Court knows, this is all about how many cups of coffee can be made from a canister, canisters of various sizes. Their expert never made a single cup of coffee. So it's completely abstract. And their expert on the measurements, she just measured the quantities. There's no dispute that the coffee quantities in the canisters were satisfactory and accurate. She measured things with a spatula and this kind of hokey methodology, but accepting it as admissible. But even she came up with respect to the best-selling coffee canister Folgers makes and the one that Mr. Smith purchased, that after all her experimentation, she came up with 239 cups using the pot method for 10 cups. Where is this in the record? It's all over the record, Your Honor. In fact, if we look at the 239 cups, if the Court looks at the document 260, paragraphs 11 and 22, we talk about this in our opening brief at page 12. The class cert opposition also talks about the fact the other classic roast sizes, it's 97 percent. So we're talking right up at 240. If someone really was interpreting it to mean that. Well, where is it? Because I've read assertions that it wasn't close, wasn't even a close call as to whether or not the representation on the label would produce the number that's up, not just. And of course, the big fight is over what does up to mean? Does it mean 240 at every time in every can or some cans you'll get 240 in some cans and the way some people make it, it's going to be a little more or a little less. But I understand from just my reading that there is something in this record that says it doesn't, they don't produce that much. These cans don't match this representation. Your Honor, it's very interesting because the complaint says it doesn't come close and the district court's order on the motion to dismiss said that based on their allegations it doesn't come close. They originally focused only on the one cup method, which requires more coffee than if you make. So it's the number of tablespoons is, you need one tablespoon for a six ounce cup of coffee, but for ten you need eight. And so they focused on that one. Then they realized that the up to language could be interpreted as we interpret it, that the canister can make up to 240 cups and our position is that means using the method that makes ten cups. And so their arguments shifted. And so when they had to get an expert, the expert gave testimony that with the ten cup method and the classic row size, 239 cups was the amount. And so wouldn't these things go to, just while I'm thinking about it, to the more merit of this claim ultimately whether it succeeds on the proof that's there as opposed to whether or not it qualifies as a class action. That goes right to one of the issues I was going to get to very quickly here, Your Honor. As this court said way back in the Averitt case and the Supreme Court said in Dukes, Comcast, sometimes the class certification issues aren't meshed in the merits. So in determining whether a case can be tried as a class, you have to look at the elements of the claims and the evidence. And the plaintiff has the burden to come forward with proof that they can prove their case on a class wide basis. And so that does go, it does touch on the merits. But to finish the point on the coffee, because I do think it's important, our expert testified using the ten pot method easily you could make 240 or more cups of coffee, whatever up to is interpreted to mean. And what was that based on? That was based on his own measurements. He actually made coffee, you're saying? He used the Folger's protocols where coffee is made. But then he mapped, he did a similar measurement exercise like the plaintiff. So he didn't make coffee either? He didn't. But Folger's has. It's made a lot of coffee. And it believes the representations are absolutely accurate. Well, my interest would be what's in the record about somebody making coffee? Well, there really isn't any evidence. There's nobody, Mr. Smith didn't take a canister of coffee and try to make it and say I only made 237 cups of coffee. That's what this case is really divorced from reality and things that happen to real people. And that brings me to the, just to go right to this court's decision in Huddock. Well, first let me just say, on the class action rules, the Supreme Court said in the American Express case that Rule 23's standards are stringent and exclude most claims. This court in Huddock and St. Jude explained that consumer fraud cases like this one, this is a quote, often are unsuitable for class treatment because proof often varies among individuals concerning what representations were received and whether consumers relied on the representations. And this case presents those problems multiple times over. The Missouri statute includes a requirement that the plaintiff provide proof that they suffered an ascertainable loss, that they acted reasonably in light of all the circumstances. So the person who's claiming damages has to prove that. They must prove that the individual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty. And this court in Huddock, which really, the court doesn't really need to go any farther than Huddock. It involved consumer protection statutes from Minnesota and New Jersey that mirrored the Missouri statute that included the ascertainable loss requirement. And in Huddock, the court noted that the causation is a necessary element. So an individual has to prove that they suffered an ascertainable loss because they were affected by a misrepresentation. I'm sorry, counsel. Yes. I think this is relevant at this point in your presentation, but I'm wondering are you challenging the district judge's ruling that the damages are measurable using the plaintiff's theory of liability? We are. We don't think that that sort of price premium approach works at all here. The court's decision in Johanneson is a good example of why, where the court rejected the same sort of price premium test, where there were questions of reliance and where the defendant has the right to. . . The so-called benefit of the bargain. Exactly. Theory.  That where a consumer, we don't know about any other Missouri consumers whether anyone is dissatisfied with the coffee here. But if an individual didn't see or rely or care about the up-to language, got coffee they loved, that they drank, had no complaints about the coffee whatsoever, and got the benefit of their bargain, that person can't be included in the class and their damages, the price premium that plaintiffs push, can't be calculated because of all the individual issues. The court in Johanneson on that case, Your Honor, the language is quite fitting. The court said, Cases are not tried in the evidence of one party. Polaris would be entitled to present contrary evidence suggesting the price premium theory does not provide proper damages figures for each specific class member. So that's what we have here. More fundamentally, as to liability to each class member, an individual has to show that there was a causal nexus between the misrepresentation and their loss. That doesn't change in a class action. That's what Dukes held. That's what Comcast held. That's what this court has held in multiple cases. This court's cases are so directly applicable here. And as the court said in Huddock, here Folgers, the court was talking about the TVs that were issued in Huddock, whatever their evidence is, that we think their expert evidence is extremely weak. But even if it's admissible, and we're assuming that before this court, we get to then put on a defense as to each individual class member. And that means, in this court's words in Huddock at page 777, present evidence that consumers did not see or did not rely on the allegedly false representations. And their experts, again, assuming their testimony is admissible, but they didn't replicate the shopping experience. They conducted surveys that were very artificial. But consumers go in and buy a coffee they like and go and make it. It's a super individualized process, making coffee. What's a scoop? What's a tablespoon? Some people like it stronger. Some people make it weaker. So the canisters are going to make different amounts of coffee depending on the individual. So the activity itself makes this highly individualized. Counsel, so kind of in line with the theme of your argument here, for clarification, for my benefit, if you don't mind. So would you say this is a commonality and predominance issue? Or is it a standing issue? Or is there really any difference between those? It's really both, Your Honor. There's a difference, but the simplest route is the predominance and commonality issues. The individual issues here would be incredibly voluminous and would swamp any trial. Because they need evidence, and they have none. They have no evidence that Missouri consumers interpret up to to mean a guarantee of 240 cups or something close to it. That's just Mr. Smith in this court. And all the individual issues, their common issues, going to the expert testimony, Judge Shepard, and I'll come back to standing. But even their own expert, Mr. Dennis, he didn't ask people how they interpreted up to. He asked them a subsidiary question, which was would they view the up to language as applying to both the one-cup-in-the-pot method. And he said 72% said that they would. So he's 28% even under their own expert. So those 28%, we would get to show that those people viewed up to to mean something different. And so there's a predominance problem. And then on standing, Your Honor, they're closely related. And again, this court in Johansson and other cases has talked about the standing question. There would have to be some sort of proceeding to determine who was actually injured, who suffered the concrete particularized injury that gives that individual standing in order for that person to be part of the class. And the process for doing that, the plaintiffs haven't proposed anything. It's the same problem they have on ascertainability. They're saying, well, people could just say I bought coffee for personal and family use. And then maybe Folgers could challenge it in a claims administration process outside the jury. So just overriding Seventh Amendment rights, which the DC Circuit and rail freight said was improper and the First Circuit said was improper in the case we've cited. So there are just incredible problems here. The common part of this that I seem to recall the district court relied on was the fact that the representation itself was the same to everybody. And that's one issue, Your Honor. And that's the starting point. So as Justice Scalia said in Dukes, it's always easy to find some common issue. And maybe many common issues. But the question is, will that common issue lead to common answers that will drive the resolution of the litigation in one fell swoop or in one stroke, he said. Here, the representation was the same, but people interpret it differently. And they're saying that their theory is that they can show on a class-wide basis that everybody in Missouri who bought Folgers coffee when they were shopping grabbed the canister, saw the $2.40, turned the canister, looked at the recommendations, interpreted the recommendations in the up-to language together, and decided that they would get 240 cups of coffee out of that canister. That they relied on that, and they would not have bought the coffee other than that. Why did the district court hold that Hutter Consent, too, or not applicable? The district court, this is, I think, a significant legal error, Your Honor, found that because in Huddock, the defendant had submitted some survey evidence of its own. But here, instead of doing that, we went one better. We put in testimony from real-life named plaintiffs in the other MDL, and from Mr. Smith in the MDL, their testimony was they kept buying the coffee, so they didn't rely. When we get to show this with respect to every class member, they didn't rely on the representation, even after they knew, allegedly, it was incorrect. They kept buying the coffee because they liked the coffee. Johanneson talked about that, where the people kept buying the ATVs, even after knowing the supposed defect. And so the judge said, well, that was different, because there was no survey evidence. And the other point, Judge Arnold, and maybe I'll stop with this, is the court said, well, we used out-of-state plaintiffs. But it was sworn testimony from real people who were before the court in the other MDLs making the same claims. But then the district court turned around on the plaintiff's experts and said that even though their surveys were nationwide, those could be used to prove commonality. So it was a complete double standard. And those were anonymous people from other states who we don't even know who they were. And the district court wouldn't consider the sworn testimony of all these plaintiffs in the MDL who said different things. How is this case different from the other proceedings that are taking place around the country? There are, I think, four other state class actions that are now in the MDL in the district court. And they're generally the same. Generally the same theories. Different statutes are involved. Different consumer protections. How many of them have qualified for class action? This is the first one the court took. Originally the briefing was done for all the cases at the same time on class certification. The judge decided to focus only on Missouri. So this was sort of the test case. That's why I think it's important that the court decertify this class. It's your classic effort to sort of come up with a class action where there's no proof that anyone has really been injured, particularly in Missouri, where there's no evidence about anyone in Missouri other than Mr. Smith. And here, in this case, the alleged, the class as described or as asserted is not tethered to misrepresentation or reliance. It's simply the class of purchasers of the coffee. Exactly. And we would have an opportunity and people would come in and say, I bought the coffee. Or I'd say, wait, no, you bought Maxwell House. No, you didn't know about this statement. Test those representations and that would create many trials that could go on forever. That's why the class should be decertified. And I will reserve my remaining time. Thank you. Thank you, Mr. Boutros. Mr. Danis. May it please the court, Glenn Danis, for the plaintiffs here and at police. So I think it's important to make a few points to respond to my friend on the other side. Number one, every class member here suffered the same injury based on the exact same representations. My friend on the other side... What is that common injury? The common injury being paying more for the product than as was represented. It's the same exact injury as to every single person. It's an economic injury. And what I'd like to explain is that the real problem here is that... Well, what if they actually got the amount of coffee that was on the label? So that would be a merits issue. So if, in fact, they got the coffee and no one was fooled, Folgers put in the amount of coffee that they promised, that's a merits issue. At pages in the record, 798 through 799, the metrologist expert, Hocker, explained that all... For both brewing methods that are on the can, every single type was shortchanged in different amounts. It was an average of a 7% by one method. Based on what? What was done to show that that shortage was inevitable? Measuring, Your Honor. She measured, I believe, 800 different times. When you say measured, did she make coffee? I mean, that's kind of the common... It was based on weight, Your Honor. It was based on weight. And, again, if her method of determining coffee cups or servings through weight was wrong, that would have been something for the Daubert motion. That is something they could bring in a renewed Daubert motion. That's something they could bring up in a motion for summary judgment. That's something they could bring on a trial. They have already had multiple chances in four different Daubert motions to make all of those arguments. And they were fully aired with respect to Dr. Hawker. But a point that I'd like to make is that the other side is glossing over incredibly important differences in state law between this case and Hudak and Johanneson, between Minnesota law and Missouri law. This court in Johanneson distinguished specifically Missouri's MMPA from the Minnesota statute. In Johanneson, this court distinguished those two sets in another case involving multiple state law classes and said, Missouri is one way. Minnesota is another. Minnesota requires individual reliance. Minnesota consumer statute requires individual inquiries. The Missouri statute does not. The Missouri statute, the MMPA, is based on an objective, reasonable consumer standard. All of this, 90% of my opponent's arguments are based on these supposed individualized determinations that are simply not required. Hudak was based on Minnesota law. And again, as this court found in Johanneson, that is not this case. Hudak is also distinguishable because in Hudak the actual representations differed. The other side was able to put on evidence saying that the TV refresh rate was different. The representations were different. Some of them said refresh rates. Some of them said it was expressed in hertz. Others didn't have anything and just had a number. And they put on affirmative evidence that people didn't care about that under a statute that requires that as part of the predominance issue. That is not the case here. Well, you still have to have evidence of causation of the injury. That's absolutely true, Your Honor. And the evidence of causation here is class-wide. And it's twofold. Number one, it's Dr. Dennis, who found that 72.4% of the class or of the survey, rather, showed that people believed that they could get the up-to claim by the two methods that Folgers shows on the side of the canister. And it also, through Dr. Iyengar, who showed through causation that 60% of the people she surveyed, this is at pages 1246 and 1247 of the record, 60% said the number of servings is very or extremely important to them when they buy coffee. That's class-wide information showing that people care about this representation and make their decisions based on it. It doesn't say anything about what actual individuals did with respect to the representation. So all of this has to do with the prism of state law. The state law requires a reasonable consumer standard. I'm sorry. I think I'm not making my point. I'm sure it's my fault. Let me put it to you this way. Are you relying heavily on the Turchikovic kind of analysis, the benefit of the bargain analysis? Is that your main reliance here? If you lose on that point in terms of your theory of liability, is the case over, or do you have another theory to offer? So Dr. Warner was our economic expert, and he offered four different theories for why there is an injury. One of them was price premium. A second one was a market simulation that showed that the misstatements caused an artificial increase in demand and that everyone overpaid for that reason. So those two were the main theories, and that hues directly to the benefit of the bargain theory of liability. I'm sorry, a theory of injury, which is what Missouri substantive law uses. So, again, under Comcast, we had an economist who put on a theory of damage that is directly tethered to and directly parallel to the type of injury that's required under the statute. Now, getting back to the 72% number in the survey, what exactly does that 72% represent? What are those people agreeing? Those are people who said, I looked at the canister and I believed that I could get the up-to claim using these two methods of brewing. But is the up-to claim, where does it cut off? As I understand it, there's one interpretation of this. And I believe it's been asserted to be your client's position, is that up-to means I'm going to get $240 out of this can. Correct. That's right. So at the motion of dismiss, the other side made the argument, and I hope that I'm understanding Your Honor's question or part of it correctly. They made the argument, well, up-to isn't a guarantee. All that up-to means is up-to. Some people will get $240. Some people will get maybe more or a little less. So that argument, the district court agreed that it's not a guarantee, that it doesn't say that you get $240 all the time. But if there's a substantial difference between the number and the amount you get, that that can state a claim. That's a substantive legal determination that she made. She said, you know, if you get one cup but it says up-to $240. But the 72% number you're reciting, you're saying that represents people who are saying they interpret this to mean $240. Yes, exactly. I believe we can get $240 using one of these two methods. That is exactly what he tested. And the other side didn't put on any survey evidence to suggest that that was wrong. They took pot shots at the method and said that this methodology is wrong or he should have asked a different question. All of those sorts of merits-based points, essentially jury points, were made during both the Daubert motions and in the Klass-Herb motions. They could have put on a survey that said, no, that's not right. People believe something else about it and you're completely mistaken. People look at that and everyone knows that that doesn't mean what it seems to say to their people, according to their survey. That opportunity has come and gone, Your Honor. I would like to just continue to say that under standing, there was some discussion about that. I just wanted to make the point that the district court relied on Judge Arnold's decision and vote, which was essentially to say that there is not an Article III standing issue here because paying more for an item than it's worth is, under this circuit's law, a cognizable injury in fact that is sufficiently concrete. So the Article III issue essentially is another sort of dress-up merits argument, which is that, well, these are people, we need to ask all of them if they actually felt like they were shorted on the coffee. That's not the Article III inquiry. The Article III inquiry is essentially, do you have the sort of injury that would have gotten into a court in the 18th century? And, yes, paying more for an item than it's worth is the sort of injury that would have always gotten you into the courtroom doors. Counsel, this is a question that I've had about the case that I appreciate your comment on. Is there, in the record, any finding, for example, from your experts, about the minimum number of cups of coffee that these cans produce? So Dr. Hawkard's evidence— And then the second part of my question is, if there is, and if the minimum, you know, each one of these cans is going to give you at least this number, if that's close to the 240 I think we've been talking about, what's close enough? That's a great question. So I would answer that in two ways. Number one, in the record at pages 785 through 799 of the appendix, that lists in great detail by roast type, by product type, for several hundred items, different kinds of products, lists the, you know, what Dr. Hawkard got in terms of serving size, both under the pot method and both under the tablespoon method. So 14 pages' worth of data discussing exactly what you could get and how much the shortfall was. And I should just reiterate that the shortfall was for both methods for all products, according to her method. The second point is that under United States Supreme Court in Tyson, which was affirming this court's decision in Tyson 2, the court was saying that once you get past Darburg, this is essentially a jury issue. And unless the district court finds that no reasonable jury could rely on this evidence, it goes to the jury. So the jury, a great argument for the jury would be everyone, you know, even if it fell 26% short under one method and 7% short under another method, isn't that really close enough? Is that really, you know, is that really worth a lawsuit? Well, if a jury agrees, then they will find that that's close enough based on the survey evidence and based on their own common sense understanding of buying coffee. And then we'll lose. Well, I thought significant difference was a legal question. I'm sorry? I thought you said there was a ruling that requires as a matter of law that there be a significant difference. Isn't that right? That's right. Isn't that what you said? That's right. That's right, Your Honor. So should you instruct the jury on that? So the jury would. Is there a significant difference? So I believe the jury would be charged with deciding whether the difference is significant enough that a reasonable person would have felt deceived under the MMPA. That would be the question that a jury would decide. And a jury may well decide a reasonable person would not feel deceived by that. Getting a quarter, you know, 26% less than was promised on the label, that's not really a big deal. And that's possible. And then we lose. But that's not a class-third issue. And, in fact, that's a great reason to certify the class so that all at once this reasonable person question under Missouri law could be decided by a jury. That is a great reason to certify. So what is the at least figure? What is the minimum number that your proof shows? It's showing that you're going to get at least, the best that you're going to get is 7% short. So that's what the evidence so far, again, in AA Appendix 798 through 799, I'm sorry, 798 and 799, summing up the 13 pages before, that shows that the best you're going to get is 7% short. And how many cups is that less than 240? Well, I'm not a mathematician, but I would think that that's about 18 cups short. So, you know, depending on how much coffee one drinks, I drink a lot of coffee, so that would be about a week's worth of coffee. But for some other person, that might be several weeks' worth of coffee. That's not quite the same thing as the least amounts you're going to get. That's not the same datum as the least that you're going to get. That's true, Your Honor. So, I mean, is Your Honor's question that it should have tested what's the least amount? I'm not suggesting it should or shouldn't. I just wondered if there was an answer in the record to that one. I don't believe so, Your Honor. I thought that was the question I was going to ask. Okay, no, I believe the thing that was being tested was how much short of the up to representation you can get. Okay, thank you. So the answer is, the proof is that no can of product produced less than 93% of the represented amount, of the up to amount. Right. Under the two methods that they prescribe, no one will do better than 93% of the up to claim. And whether that is, in fact, something that is a win under the MMPA for deception is the merits issue. That's what the case is about. Why isn't that a legal question given those numbers, 240 and then 93% of 240, whatever that works out to be? Why isn't that a legal question as to, as a matter of law, this does or does not qualify as fulfilling the represented up to? Well, I mean, I think that that was really what the motion of dismiss was about. The motion of dismiss was about, you know, isn't this really just them arguing it's a guarantee? And if it's not a guarantee, they don't have a claim. And the court said, no, if it's substantially under, you do have a claim. So then the question becomes whether falling short between 7% and 26% is substantially. And that becomes a jury issue. I mean, again, Tyson says, you know, generally when you get past Darbert, this becomes a jury issue. And unless the district court thinks that no reasonable jury could rely on it, that's what the jury is there for. Never mind. This case, I mean, stepping back for a minute, this case is really the, you know, the archetypal small, you know, small value, you know, absolutely uniform misrepresentation type claim. And the district court in Diesel goes through a really excellent, you know, overview of Missouri law under the MMPA, under these types of cases and talks about the fact that when you have under Missouri law, under the MMPA, an economic injury, an assertion that there's been a price premium, an overpayment as to everybody. And again, the MMPA uses this objective reasonable person standard. That is a class issue. That is a absolutely certifiable class issue. That case, Diesel, had to do with a, it was a Slackville case. But again, it was one that was uniform as to everybody. That's this case. Unless your honors have any other questions, I'll rest. Well, here's, this is just, I'll throw this question out. And I'm not sure if it's running within the purview of the argument. But what's the, in view of everything we've heard and the way this case is playing out, what would be the, what would be an option for the manufacturer to tell the consumer what they might be able to expect without eventually becoming the subject of a class action? Sure. I mean, I would say that you could express in weight what you get in the package. You can say that it makes different methods and you get, you know, the amount of coffee that you get depends on which method you make. So you get what you get. You get what you get. You can tout other aspects of the product that people might care about. My friend on the other side was talking that people love other aspects of Folgers Coffee. You can talk about all of those. But if you're going to talk about serving size, it has to be spoken about in a way that doesn't mislead. And, again, the person buying an inexpensive canister of coffee, and, again, especially one that people generally buy because of its low cost and its economy, is one where this particular attribute is quite relevant and matters quite a bit. And it matters how it's presented. Okay. Well, thank you very much. Thank you, Mr. Dennis. Mr. Boutrous, your rebuttal. Thank you, Your Honor. Let me just start back to Huddock and the statutes. This court in Huddock said the Minnesota statute had a relaxed standard of reliance and that the plaintiffs didn't necessarily have to prove reliance. But it said it had a causation standard, as Judge Arnold pointed out, because of the ascertainable loss requirement. Counsel is suggesting that Missouri law only requires proof of what a reasonable consumer would do, how they would act. No. It says the individual has to prove they suffered ascertainable loss, that actual damages were caused to them that can be proven. That's highly individualized. And as this court said in Huddock, the defendants, whatever the standards, have a defensive right. And Dukes said this, the Supreme Court said, you can't certify a class by saying the defendants can't put on their defenses. And here we would have the ability and the right, the due process right, to negate, that's what this court said in Huddock, claims that consumers actually saw the statement, relied on the statement, thought it was important, didn't get the number of cups that said, the package said they might get up to. Counsel is just wrong that the Johanneson case said Missouri law was different. It just pointed to two examples. Huddock is decisive here. Counsel has no answer for the ascertainable loss requirement. That was the exact language in Huddock, the statutes in Huddock. And the court said that too many individuals have issues. It would be predominating. Huddock says that, St. Jude says that. It's the same statutory language. Counsel is just ignoring what the Missouri statute says. Counsel is also wrong about this notion that Tyson said, if testimony is admissible, expert testimony, it goes to the jury. Tyson did not say that. In fact, Walmart, Comcast say that you have to scrutinize the expert's testimony to see if it can allow for a common determination of core issues to the case. Even if it's admissible. And if you go back to the Dukes v. Walmart, the court said, this testimony will assume it's admissible. But then it went through in detail the testimony and said, this doesn't get them there because it doesn't prove commonality of the issues. And it's interesting because one of the rulings was that the experts relied on national and regional studies, which didn't tell you what happened at the local level. Just really like what we have here. Counsel is misinterpreting the law. If something overlaps with the merits, that's exactly what this court and the Supreme Court has said. You still need to grapple with it at class certification. Thank you for your patience, Your Honor. Thank you. Thank you, Counsel, for both parties and the presentations you've made to the court this morning. It's been helpful. We'll continue to wrestle with the issues and give forth our best resolution. Thank you.